May it please the Court, Brian Matsui for Bard. I'd like to try to save three minutes for rebuttal. The District Court's judgment on patent misuse in Quantum Marowit should be reversed. For patent misuse, the District Court took an expansive view of Berlotte and Kimball and failed to heed this Court's admonition not to expand the doctrine. And for Quantum Marowit, the District Court erred when it treated Bard's claim for Quantum Marowit as if it was one for promissory estoppel, despite the fact that this Court in Kimball and the Seventh Circuit have said that the two are not the same. Now, if I could start with Berlotte, the minimum payments here are nothing like those royalty provisions courts have previously held are unlawful as patent misuse. If we look at Kimball, for example, that was a 5 percent ongoing royalty in perpetuity. Those provisions were explicit that they were compensating a patent owner for the post-expiration use of a patent. But Kimball makes clear that just because a patent extends payments beyond the patent's expiration doesn't mean that you have patent misuse. Kimball said that there are many ways around Berlotte, and it said that all the decision bars are royalties for using an invention after it moved into the public domain. Now — Sotomayor, it seems like that language you just quoted suggests that we're supposed to look at the agreement on its face, but somehow this case took a tour into, like, the party's intent in a trial. And I'm wondering how we got down a factual inquiry into intent instead of just a facial look at the agreement. Well, I think that that's the case because the parties moved on summary judgment and the court decided that the agreement was ambiguous, and so that's why you had a trial on the party's intent. But I think that ultimately what you're looking at here is an interpretation of the contract, which ultimately is a legal conclusion. And I think that under Kimball — Do you agree, then? Do you agree that the contract itself is clear and unambiguous, or do you believe that — or is your position that it is ambiguous? I think that it's silent, and so that it's — you can characterize it as ambiguous, but I think that when you have a contract that is silent as to what these minimum payments are for, that is not enough to show that there's patent misuse. I think courts have been very clear that you don't construe a contract in a way that makes it unenforceable, and that's what we have here. But if we took your position that what we're looking at is an ambiguous contract, I think you go down a path that maybe is not so favorable to your position, is it? I think that — certainly I think that this can be resolved on the intrinsic record alone because if you look at the agreement, there's nothing in the agreement that affirmatively links the minimum payments to the ongoing use of U.S. products after the patent expires. And so that would be a way to period stop right there. I think that also when you look at certain provisions in the licensing agreement, like Section 3.1 and Section 3.2, it makes clear that you have use royalties for using the 135 patent that extend only until the patent expires. And after that — But the minimum royalty payments don't go down or change after the patent expires. That's true. They don't — they don't go down or change after the patent expires. And the only thing that's applied to them, then, are the Canadian royalties, which go until the Canadian royalty — the Canadian patent expires. That's how 3.1 operates, that it has a use provision so both the U.S. patent and the Canadian patent have four use payments that are then applied to the minimum payments. But we could read this agreement as saying that the payments were for whatever was still in effect, and in this case, the Canadian patents, correct? You could read that. I mean, that's when you look at the agreement. It's certainly a way to read the agreement. I think that the important point, though, is that when you have an agreement like this that is completely silent as to what these minimum payments are for, you don't then presume that you have patent misuse. Because as this Court said in Zillow, you don't look for additional ways to expand Verlotte. As the Supreme Court said in Kimball, that there are many ways around Verlotte. And it only precludes one thing. It only precludes these ongoing per-use royalties after the patent has entered into the public domain. And so is your — what do you think these minimum payments were for? I mean, is your argument that they were just spreading the U.S. royalties across time, and so they go into the time later? Or how do you explain what they were for? I mean, I think that when you look at the agreement, there's — it's very clear that — or when you look at the entire record here, it's very clear that it's hard to sort of dissect what these minimum payments were entirely for. It's very clear that they were meant to capture some past use of — of — by Atrium of BART's patent rights, and they were also meant to capture some aspect of use. Counsel, if that's the case, then you lose, right? No, we don't. We don't lose, Your Honor. Isn't it your argument that it doesn't matter what was intended? If the plain language on its face does not clearly articulate payment for an expired patent, that's all under Broulot. I mean, this would be different if we're talking about a commercial dispute between the parties with respect to the enforceability of any one of these provisions. But for Broulot purposes, it doesn't matter what the intent was. I think that's right. All that matters at the end of the day is when you look at this agreement, what the use — you know, what the — what was these minimum payments, these payments that were after the patent expired, what were they in compensating the party for? And here, there's just no indication that this was meant to sort of compensate somebody for — But why do you — why do you have to make that argument? I think I'm confused by your sort of toggling back and forth between the plain language, you know, without really expanding Broulot, makes it clear that the payments — the minimum payments would be what they are regardless. But then you're also saying you can — that they did account for the U.S. patent sort of expiring and coming out. So I don't know why you need the second argument under your — We don't need the second argument, Your Honor. And I think that what I'm — I'm sort of reacting to the fact that there was a trial in this case, you know, on this provision. And the district court, you know, made certain determinations. But we don't have to get there. If we look at the contract and the contract is clear by its terms, we don't have to get beyond that. We don't have to look at extrinsic evidence. We just will look at the contract itself. And can it be read in this way? Yes, it can be read in that way, Your Honor. And I think that, you know, also if we look at the last patent rule, for example, that the Supreme Court, you know, made clear about in Kimball, you know, it said that under Bullock, royalties may run until the latest running patent covered under the patent agreement expires. And that's precisely what we have here. We have royalties in the form of minimum payments that are running until the last patent expires, and here the Canadian patent. And so I think that when you just look at the agreement itself, the language of the agreement itself, the Court doesn't need to go any farther. I'm merely reacting to the fact that, you know, if you did get to the extrinsic evidence, I still don't think that it points to showing that there is patent misuse when you look at the negotiating history. But I think that when you just look at the — Well, counsel, it sounds like there is by your admissions today. You're paying for sort of past, you know, past products or so. I guess that's what I understood you to say earlier. Well, see, I don't understand. Yes, Your Honor, but I would say that the minimum payments could be many things, but that doesn't still demonstrate that those minimum payments, when you're talking about past infringement damages, for example, that is not something that would be the ongoing — payments for the ongoing use of a patent after it expired. And I think that, you know, to just — I know that we don't think — I don't think that it's necessary that we look at this extrinsic evidence, but when you look at what the negotiating history was, what Bard wanted was it wanted to basically get a per-use royalty that would have ended in 2019. And the minimum payments from the negotiating history that the district court looked at could be said to just be a proxy for that. And that's what the district court found. And that's a proxy, then, for something that would end in 2019. It doesn't demonstrate that you would have patent misuse, that this would be compensating Bard for the post-expiration use of the patent. And I'm — so I'm saying that is, like, even if we get to the extrinsic evidence, we're still in a situation where we still wouldn't have patent misuse. Lastly, I would just like to turn to quantum error at two. And this is our backup argument to if the Court were to determine, were to affirm the district court on patent misuse. We think that the district court got it wrong here. It just treated our quantum error argument as if it was the same as a promissory estoppel one. But this Court in Kimball noted that you can have a quantum error claim if there is patent misuse, that you're just trying to put the party basically in a position in which it gets its fair market value. And so you're not actually trying to enforce a promise in that situation. And the district court treated the two of those the same. And so in the event that the Court were to determine to affirm patent misuse, it should still send it back on quantum error to determine what would be the fair market value be of what Bard provided to Atrium over the course of its agreement. If there are no further questions, I'd like to reserve the rest of my time for rebuttal. Good morning, Your Honor, and may it please the Court. First, apologizing because I'm wearing jeans. I had torn my suit pants on the way out of my hotel room this morning. I didn't even notice, but thank you for the apology. No problem. Hopefully not a bad omen for our case. I've done that before. So I'll start with the patent misuse issue. Your Honors were asking questions about whether or not you simply look at the language of the agreement and that's it, and there's nothing else to be considered. We moved for summary judgment early in this case, saying that the language of the license agreement itself supports that there's patent misuse. And I'll turn to that language in a second. The reason the district court denied summary judgment, he quoted this court in Zillow, which says that we have to look at what Zillow is paying royalties for and under what conditions its obligation to do so is lawful. So the court had to figure out what does that minimum royalty provision mean. The thing that I don't understand, though, is we have Kimball after Zillow. So Kimball says from the Supreme Court, the language that your opposing counsel quoted, that you can basically get around this. You know, there are ways to get around this. And so if the whole notion that you can get around it seems to suggest that we can't really have an inquiry into intent into whether you're trying to get around something because the court says you can. Yes, Your Honor. It's totally possible to get around it. And that's what we held this entire trial about. It was what does the minimum royalties provision mean. The judge wanted to see, well, were the parties contemplating a way of actually getting around it? And the way to get around it is exactly what Brulat and what Kimball say. You take all these payments during the proper term of the patent. Here the patent expired in 2019. So you would be accruing royalties. You'd be, you know, taking this big pool of money and then spreading that out over the longer term. That's not what happened here. The judge held an entire trial about the party's intent. But why can't we just look at the face of the agreement and say it looks like they were spreading it out? You absolutely can. And maybe you should turn to the plain language. I think you were, I mean, to Judge Friedland's point, I think the statement that you made at the outset, which is I'm going to point to the language that on its face establishes the very point that you're trying to make would be helpful. So, yes, absolutely. And there's, in starting with that language, there's nothing in the language that says minimum royalties are a deferred payment from 2011 to 2019. It just doesn't say that at all. But what in Kimball says you have to say that in the contract? Why can't you just have something that might be that? Does Kimball say that you have to explain in the agreement the reason we're doing this is because we're trying to spread out the payments? Kimball doesn't say either way. Kimball just says, just like Zillow did, that you're supposed to figure out what is this, what are you paying royalties for? So that's why the judge held an entire bench trial to figure out what was atrium required to pay. Well, but your agreement says that it covers licensed products, correct? So the minimum royalties provision, it's undisputed between the parties. Right. That within that minimum royalties, it is for ICAST, which is not so there's a capital L, capital P licensed products. That is a defined term in the license agreement for the vascular products. So there's really two buckets of products, right? There's these vascular products, and then there's ICAST. Okay? It's undisputed, undisputed. Both sides agree that payment for ICAST is the core part of the minimum royalty. That's what the district court found. That's one of his key findings of fact, that within that minimum royalty, it is payment for the ICAST product. So let me walk through why the license agreement text itself supports that this is patent misuse. So starting with Section 3.2, the title is minimum royalties. A royalty is a payment for the ability to use a patent. 3.2, again, does not expire in 2019. It is required to keep you keep paying it out for another five years after the expiration of that patent. My colleague across the bench will be quick to point out that the royalty label isn't dispositive, and it's not. But it's certainly supportive. If the parties didn't think that the minimum royalties were a payment for a royalty, they could have called it something else. They could have called it a flat payment or something, but it's titled a minimum royalty. Next, if you look at... But it says only on sales in countries with outstanding patents. I thought that's what it said. So that's 3.1. That's the 15 percent royalty on the capital L, capital P license products, which is those vascular products. What happens in 3.2, which is the minimum royalty, there are two parts of it, 3.2A and 3.2B. Okay? 3.2A deals with ICAST getting this expanded approval. So ICAST was originally approved just for what's called tracheal bronchial uses. That's uses in the throat or the lungs, the windpipe, really. So if Atrium had applied for an expanded approval, for vascular approval, if Atrium had received that vascular approval for ICAST, its sales would have gone through the roof, and it really wanted to get that vascular approval. If that happens, the agreement changes the ICAST product, which is on Exhibit B to the license agreement. It changes the ICAST product from a non-vascular product into a vascular product, and minimum royalties cease. They go away. So basically the sales of ICAST would go up, no more minimum royalties, and then ICAST becomes a licensed product, and under 3.1, payments would be made for ICAST until the expiration of the U.S. patent. That until the expiration of the U.S. patent language didn't make its way into 3.2, which is why we have a patent misuse problem. Same thing with 3.2B. If the original approval for ICAST, which was for tracheobronchial uses, if for some reason the FDA rescinded that and they took away all ability to sell ICAST, then minimum royalties, 3.2, the whole section goes away because then ICAST is off the market and Atrium is not making any money on it, and there's no sales, and so there's no more minimum royalties. So it's clear from the text of 3.2 that it's tied to sales of ICAST. And again, there's no dispute that ICAST is what the minimum royalties were all about. The only dispute is whether, you know, my counsel across the bench is saying, well, it was really for this pool of money from 2011 to 2019 and it's deferred. We're saying, no, it's ongoing. And the text of the language supports that it was ongoing. But in addition to that, the judge held, you know, the district court judge held an entire trial to try to figure out, okay, what is the minimum?  But, like, maybe this trial happened for nothing. So we're trying to back up and say, let's look at this agreement and figure out if it violates what Kimball is saying. Yeah. And I guess I'm still having trouble understanding how, when you look at this agreement, it doesn't allow — you can't explain it by, okay, there were all these contingencies, whether the FDA approval would happen. The parties had some negotiation in a black box and came out with some division of risk between them that had an amount of money and spread it out over the life of the patent. Like, why is that not a proper interpretation of what happened here? And why is that improper under the Supreme Court's opinion? Because the license agreement itself says nothing about deferring payments whatsoever. And the language is clearly — of 3.2 is clearly tied to the payment of a royalty, and it's clearly tied to ICAS sales. It's not even — the other side is not even disputing that it's tied to ICAS sales. But so it uses the word royalty, but you said that's not dispositive. It's not. But it's supportive. And the judge thought that there was an issue of fact here, which is why the district court judge wanted to figure out what is this provision. He thought, like my colleague said, that the license agreement was ambiguous. So he wanted to figure out, okay, what were the parties negotiating here? What was the point of minimum royalties? And it was clear from all the testimony at trial that minimum royalties were payments for ongoing use of the ICAS product and the ability to sell ICAS on an ongoing basis. And to the extent — okay, so the Canadian sales, there are still Canadian sales. Now, I understand you're saying, like, this $15 million, like, is way too much money for the Canadian sales. Yes. But what prevented the parties from essentially spreading out the payments by just using the Canadian sales, even if it's a ridiculous amount? What's wrong with that? That would have been perfectly appropriate if that's what happened, that there's no evidence at all that anyone was trying to have the minimum royalties for any part of the Canadian sales. All of the testimony is that the minimum royalties were for ICAS. And that's what the district court judge found. ICAS was the heart of the deal. Their witnesses said it's ICAS. Our witnesses said it's ICAS. There's no dispute on that point. And the language of the agreement, again, it's very supportive that it's ICAS. It's talking about the nonvascular products in 3.2a and 3.2b. It's only one nonvascular product. It's ICAS that's on Exhibit B to the license agreement. So, Your Honor, if I can turn to the testimony from trial. So testimony also supports that minimum royalties were payments for Atrium's ongoing right to sell ICAS. Mr. Schofield, who was Atrium's chief negotiator, stated that ICAS sales were part of what the $15 million minimum royalty was for. That's in the record at page 429. Mr. Krause, who was Bard's chief negotiator, he agreed that what ended up happening in both the Gore case that Bard points to and in this case was that quarterly royalty payments were made for current sales. Mr. Krause also testified that $3.75 million a quarter was a way to get some money for ICAS being on the market. And that's in the record at page 537. There were also contemporaneous e-mails. Mr. Schofield had e-mailed Mr. Krause January 3, 2011, and this is in the supplemental record at page 85. In his e-mail he said that payment for royalties, and he's talking about the minimum royalties here, he says payment for royalties for past sales in addition to royalties for current sales would be applied to meet the $15 million minimum. And then in subsequent discussions with Bard, Bard never disputed that minimum royalties were for current sales, including current sales of ICAS. There's also ample evidence supporting the Court's finding that no one ever discussed or contemplated making deferred payments. Mr. Krause, again, that's Bard's chief negotiator, he said deferred royalties were never disclosed, never discussed. That's at 530 and 531 in the record. And then all of the atrium witnesses, Mr. Schofield, Mr. Karwoski, who was atrium COO, Mr. Carlton, who was one of the business leads, they all said that there was never any notion that atrium would somehow be deferring ICAS royalties beyond 2019. In addition, and this is important for several issues, including quantum merit, there were internal Bard spreadsheets that show Bard was only expecting payment of the minimum royalties until 2019. They have a spreadsheet showing every year $15 million, $15 million, $15 million, and it ends 2019. That's in the supplemental record at 131 and 135. Also, this notion of deferred payments, which is really Bard's entire argument, that they say, oh, it's a deferred payment, it doesn't make any sense within the structure of 3.2. Because if atrium had gotten FDA approval to sell ICAS with a vascular indication one day after the only U.S. patent expires, then under the agreement, the minimum royalties end, and Bard would lose five years of these alleged deferred ICAS payments. Bard had no reason why it would agree to such a scenario where its deferred payments simply vanish. But everyone expected that the FDA approval would come much earlier, right? That's absolutely right. If everyone was just operating under a mistaken understanding for this whole negotiation, it's a little hard to unwind. So if everyone is operating under this, and this is true, everyone did believe that it would be approximately two years and then atrium would get FDA approval. All of that contemplates under this agreement that minimum royalties end and that the payments are made under 3.1, which is the 15% royalty. And that very point right there undercuts the quantum Merowit argument. Because for Bard to show that they have a quantum Merowit claim, they had to have an expectation that they were going to be getting paid this extra money after 2019, but they couldn't have had any expectation because everyone agrees that the expectation was going to be that there would be FDA approval for the vascular indication within two years. And so if that's the case, there's not going to be this big chunk of extra deferred payments after 2019. Your Honor, unless you have anything else, I'll sit. Thank you. Thank you. Just a few points, Your Honors. First, under Kimball, the agreement doesn't need to say that these are for deferred payments. If there's patent misuse, the agreement needs to show that these payments are for the post-expiration use. We don't — the courts have said that they don't construe contracts in a way to insert a term that would make them unenforceable. And that's basically what Atrium's argument does here today. It takes an agreement that doesn't say that these are for-use royalties and wants to insert a term to make them unenforceable. And construing an agreement like this would undermine the policy favoring settlement. The parties were in a protracted dispute. They had filed a complaint. And this is the way that the parties settled the dispute. And it would undermine that policy to say now that Bard does not get the benefit of the bargain that it agreed to. Now, on the FDA approval part on section — on 3.1 to 3.2 of the agreement, these were just contingencies that were negotiated into the agreement. Everybody knew that this license agreement was going to include both the U.S. and the Canadian patent. They knew about that months before they signed the agreement. They asked for the Canadian patent number. They got it. All these provisions about when the minimum payments were in — would end were just contingencies based upon the fact that Atrium had assured that they would get FDA approval in one to two years, which they didn't do. There's no reason now to take away that benefit of the bargain for Bard when things just didn't turn out the way that people expected it to at the end. On the last patent rule, again, I just would reiterate that we have two patents here, an unexpired Canadian patent. And in that situation, Kimball makes clear that you can have the — the royalty continue until that last expiring patent. And that's what we have here under section 3.1. Those Canadian royalty minimum payments would then get applied to the minimum payments in section 3.2. If there were $4 million in royalties from the sale of the Canadian patent products, then there would be no minimum payment that period because the Canadian patent royalties would have exceeded it. And then, lastly, on Quantum Marrowett — But would anyone have expected that would ever happen, that the Canadian sales would be that high? I don't know if any — I don't think anyone would have expected that. But a lot of — when you're looking at this ex ante, what people expected, I think that people did not know how many products, licensed products, would be sold during the course of the agreement. They did not know when FDA approval would happen. These were things that were just unknowable. So when you have things like minimum payments, that basically provides a way to allocate for those various contingencies which may or may not occur. But that doesn't make it — make those payments for the use of an expired patent. Certainly not in an agreement that's structured like this one, where there aren't royalties that extend beyond the life of the last expiring patent, where there's nothing in the provision itself which indicates that this is for the use of the expired patent. And then the last point I'll make is on Quantum Marrowett. You don't look to see what Bard was trying to get in the contract when you're determining what Quantum Marrowett is. You don't look and say the total value of the agreement would have been, you know, X million dollars. What you do instead is you determine what the fair market value of the agreement would have been. And just to illustrate the point very quickly, let's say we had a situation in which a startup was basically going to have a 0 percent license for the 20 years in which a patent was occurring, and then try to get a 10 percent license on the products once that startup then could, you know, produce something. That would be patent misuse probably because you would have post-expiration use royalties. But if you had a Quantum Marrowett claim, you then would determine what was the value that was provided to that startup. And you might determine that, you know, that would have been a much higher number than the 0 percent royalty that the party got. If there are no further questions, we would ask the court to reverse. Thank you both sides for the helpful arguments. This case is submitted.
judges: FRIEDLAND, MENDOZA, DESAI